UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. 03-CR-10317-JLT |
| v. ) | |
| ) | |
| 1) JOHN PAKALA ) | |
| 2) ANGEL GONZALES, ) | |
|     a /k/a Porky ) | |
|         Defendants ) | |

MEMORANDUM OF LAW IN SUPPORT OF
GOVERNMENT'S MOTION FOR AN ORDER COMPELLING THE
PRODUCTION OF FINGERPRINTS, PALM PRINTS AND DNA SAMPLES

The United States submits this memorandum of law in support of its motion for an Order directing the defendants, John Pakala, (Pakala) and Angel Gonzales (Gonzales), to provide palm prints and a DNA sample to the government for purposes of analysis and comparison and for an Order directing potential witnesses Angel Acevedo, James Davis-Sanon, and Kencheser Martin to provide fingerprints, as well as palm prints and DNA samples, for the same comparison and analysis. There is probable cause, determined by the grand jury, to believe that the defendants committed criminal acts relating to certain firearms and a reasonable basis to believe that obtaining these samples will help to either establish or negate the identity of the individual or individuals who handled the firearms. With respect to Acevedo, Davis-Sanon, and Martin, there is also probable cause, but certainly reasonable suspicion, that these individuals also were involved in criminal acts relating to the firearms and a reasonable basis to believe that obtaining their samples will serve the same purpose of identification.

**Background**

The United States submits that a hearing on this motion would show that on June 18, 2003, Robert Boudrow, of Winthrop Road in Chelsea, contacted the Chelsea Police Department and reported that five handguns had been stolen from his residence. Boudrow described the five stolen firearms as a Heckler and Koch 9 mm pistol, serial number 24-049373; a Colt .45 caliber pistol, serial number 70B31251; a Colt .45 caliber pistol, serial number FN32227, a Ruger .44 caliber revolver, serial number 500-81258, and a Smith and Wesson handgun, serial number N26407[1]. Boudrow told the police that he left his home at about 4:30 p.m. on June 18, 2003, and returned about 9 p.m to find his firearms missing. Boudrow told police that a man he knew as "John," whom he allowed to stay in his home for the last few days, was in the house when Boudrow left earlier that day. Boudrow told the police that he met John through Boudrow's church, the First Baptist Church in Revere. John was working at the church and had no place to stay so Boudrow allowed him to stay with him. Boudrow reported that John was not in the house when he returned at 9 p.m. but that John's truck was still parked in the driveway. A Chelsea police officer responded to the call and obtained a traffic citation from the truck in the name of John Pakala, which the officer turned over to Chelsea police department detectives.

On July 5, 2003, Pauline Hassett, of Tudor Street in Chelsea, contacted the Chelsea Police Department to report that a man she identified as John Pakala had assaulted her earlier that morning. Ms. Hassett also told the police that Pakala had stolen several firearms a few weeks earlier and provided considerable detail about what Pakala had told her about the theft. In this interview and in subsequent interviews by ATF, Ms. Hassett said she had met Pakala in

---

[1] The defendants are not charged with the Smith and Wesson firearm.

a bar in Bellingham Square in Chelsea, and they had a few drinks and did some cocaine together.  Pakala, who had driven to Massachusetts from Florida, began visiting her almost every day and stayed with her occasionally.  Pakala told her that he was driving around one day and saw some people working on a church in Revere and asked if they needed help. Pakala then started staying with someone he referred to as "pastor" or "priest" of the church and that while he was in the house alone he would look around.  Pakala told her he found five handguns in an upstairs closet and that he planned to steal them after he got paid and was not living there anymore.   Boudrow confirmed that the firearms were kept in the upstairs closet.

    Hassett said she did not recall the date Pakala stole the guns but remembers it was a Wednesday because Pakala initially told her he was going to wait to steal the guns until he was paid on a Friday. (The date of the theft reported by Boudrow-- June 18, 2003-- was a Wednesday.)  However, on the Wednesday that Pakala later told Hassett he stole the guns he came by her place in the morning and they headed into Dorchester to buy some cocaine.  She and Pakala got into a fight and separated in Dorchester.  She went back to her apartment about 5 p.m. and heard someone knocking at the back door but she did not answer it.  A couple of hours later her front door buzzer sounded and when she went to answer it Pakala was there, and another man Pakala referred to as "Porky," was across the street. Pakala told her that after they parted company earlier in the day he returned to the house he was staying at and took  the guns.  He showed her a large sum of money, she estimated around $500, and he told her he had sold all the guns.  Pakala said he ran into "Porky" that day and "Porky" helped him sell the remaining guns.  After Pakala told her about selling the guns, he went with "Porky" to get some cocaine and returned to Hassett's.  After taking a "hit" of cocaine, Pakala began to get

paranoid about the theft of the firearms and wanted to leave the apartment. He and Hassett went to Dorchester and checked into the Ramada Inn, using her Massachusetts identification because the hotel would not accept Pakala's Florida prison ID. Hotel records corroborate that Hassett checked in on June 18, 2003, registering for two people. Hassett said they bought about $230 worth of crack cocaine that night.

     The next day they returned to her apartment and Pakala showed her the black suitcase and a beer can on her back porch and said he had been the one banging on the door the day before. Pakala said he stole the suitcase from the same residence as the handguns and that he put the guns in the case along with a set of walkie talkies taken from the residence. Hassett turned the suitcase over to Chelsea Police and Boudrow identified it as one taken from the house. Boudrow also said a set of walkie talkies was taken. A few days after Pakala had told her that he took and sold the guns, "Porky" came by her apartment looking for Pakala and more weapons. She said Pakala came back to her apartment with one of the stolen walkie talkies and she overhead conversation on the walkie-talkies between Pakala and "Porky" about getting more weapons. Hassett identified to Chelsea police a photo of Angel Gonzales as the man she knew as "Porky."

     Chelsea police officers talked to Gonzales on July 7, 2003, and after they told him they had information that Gonzales helped a "tall white guy" sell guns in Bellingham Square and that any cooperation he provided would be reported to the district attorney's office, Gonzales provided a statement. He said that about three weeks earlier a tall, redheaded white man, who he identified as "John," began hanging around Bellingham Square and looking for drugs. He said they talked several times and then John approached him, said he had guns for sale and

asked if he (Gonzales) knew anyone who might want to buy them.  Gonzales took him to an apartment at 31 Marlborough Street in Chelsea, Massachusetts where he introduced John to Angel Acevedo, James Davis-Sanon and Kencheser Martin.  Gonzales said that John went into the hallway of 31 Marlborough Street and when he came out he told Gonzales that he sold four guns for $750 and some "coke."[2]

After Gonzales provided police this information, they went that night to 31 Marlborough Street and interviewed Acevedo, Davis-Sanon and Martin, who denied any involvement in buying the guns.  Police left the scene but returned a short time later after getting a call saying that one of the men had been heard saying that he knew who the "snitch" was and that he was going to be "taken care of."  Police returned and determined that it would be unsafe to speak to them at the apartment and transported the three to the police station.  They were not advised of their rights and were told that the police were concerned with recovering the weapons.   The three of them were allowed to confer privately and ultimately admitted buying the guns. An unsuccessful attempt was made to recover the weapons.

One of the firearms, the .45 caliber Colt, serial number 70B31251,  was recovered on June 25, 2003, near the curb in front of 19  Marlborough Street in Chelsea.  It has not been fingerprinted.  Two more of Boudrow's firearms, the Hechler and Koch, 9 mm pistol, serial number 24-049373, and the Colt .45 caliber pistol, serial number FN32227 were recovered on September 2, 2003,  in the area of  Fitchburg, Massachusetts, after a double shooting in Fitchburg in which a Worcester man was killed.  During the attempt to recover the firearms

---

[2]Defendant Gonzales made similar admissions after his arrest on the complaint in this case.

noted above, Acevedo called Chelsea Police at one point to say he was in Worcester waiting for the guns to be brought to him.

The firearms recovered in Fitchburg have been processed for fingerprints and swabbed for DNA. According to Detective Lt. Brian O'Hara, Homicide Scene Supervisor for the Massachusetts State Police Crime Laboratory, there is a palm print on the Hechler and Koch 9 mm pistol, serial number 24-049373, suitable for comparison as well as potentially identifiable latent prints, probably palm prints, on the magazine for the Colt .45 caliber pistol, serial number 32227. Additionally, two glass jars from the Boudrow residence which had contained change and which had been emptied on the same date the firearms were taken have been dusted for prints. A palm print has been found on one of these jars as well.

As noted, the firearms recovered in Fitchburg also have been swabbed for DNA. Those have not yet been processed to determine if DNA profiles can be obtained. According to Kristen Sullivan, DNA Unit Supervisor for the Massachusetts State Police Crime Laboratory, the samples are in the queue for assignment and once assigned, processing takes about six to eight weeks. If known DNA samples are provided to the lab, the processing of the firearm swabs and comparison to the known samples can be accomplished at the same time.

## Discussion

**Fingerprints & Palmprints**

The requested fingerprinting and palmprinting does not run afoul of Fourth Amendment protections. In this case, the grand jury has determined that there is probable cause to believe that both Pakala and Gonzales committed crimes relating to the possession and/or sale of

firearms taken from the Boudrow residence.   There is also a reasonable basis to believe that the fingerprinting "will establish or negate" their connection with that crime. *Hayes v. Florida,* 470 U.S. 811, 817 (1985)(recognizing "support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch.")   The government submits that there is also at least reasonable suspicion, if not probable cause, to believe that Acevedo, Davis-Sanon and Martin, were involved in the firearms transaction and that it is also reasonable to believe that fingerprinting them will help to establish or negate their connection to the crime.

Nor does compelling the defendants and the other individuals to provide their fingerprints or palmprints implicate their Fifth Amendment privilege against self-incrimination. That is so because compelled exhibition of one's "identifying physical characteristics, such as a blood sample or fingerprints, is not the forced extraction of testimonial or communicative evidence contemplated by the Fifth Amendment." *United States v. Thomann,* 609 F.2d 560, 562 (1st Cir. 1979), citing  *United States v. Wade*, 388 U.S. 218,  222-223  (1967),  *Schmerber v. State of California,* 384 U.S. 757, 761 (1965), and *Appeal of Maguire*, 571 F.2d. 675 (1st Cir. 1978). Accordingly, neither the defendants nor Acevedo, Davis-Sanon, and Martin  have a constitutional basis on which to refuse to furnish the requested fingerprints and palmprints.

**DNA samples**

In determining whether a compelled intrusion into one's body violates the Fourth Amendment, the Court should consider the extent the medical procedure threatens the health and

safety of the individual, the degree of intrusion, and the community's interest in administering justice.  *Schmerber*, 384 U.S. at 757; *Winston v. Lee*, 470 U.S. 753, 760-762 (1985).

In the present case, the government is seeking an order requiring the defendants and the three potential witnesses to submit to a benign mouth swab for the purposes of obtaining DNA samples.  This procedure is routine, minimally intrusive, presents no threat to the safety or the health of the individuals, and is completed within a short period of time.

It is also well established that compelled production of identifying bodily fluids for examination, such as saliva and blood, are outside the protection of the Fifth Amendment.  *Schmerber*, 384 U.S. at 765.  In the present case, the government is requesting DNA samples for the purpose of analytical comparison with DNA taken from the firearms recovered.  DNA is analogous to saliva and blood, which the Court has held to be of a non-testimonial and non-communicative nature. *See Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1997)(DNA samples are not testimonial.)  As such, the defendants and Davis-Sanon, Acevedo and Martin have no constitutional basis on which to refuse to furnish the requested DNA samples.

WHEREFORE, the government respectfully requests that the Court enter an order directing Pakala, Gonzales, Acevedo, Davis-Sanon and Martin to furnish to the government the requested fingerprints, palm prints and DNA samples.

        Respectfully submitted,

        MICHAEL J. SULLIVAN
        United States Attorney

By:    /s/Sandra S. Bower
        SANDRA S. BOWER
        Assistant U.S. Attorney
        U. S. Attorney's Office
        John Joseph Moakley
        United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA  02210
        617-748-3184